# CRIMINAL COURT OF BALTIMORE CITY.

Filed January 4, 1927.

EX PARTE CAPT. CHARLES H. BURNS, CHIEF OF DETECTIVES, RESPONDENT.

*Clarence W. Miles* and *Eugene A. Edgett* counsel for respondent.

O'DUNNE, J.—

Friday, December 31, after conviction of respondent the preceding day, of contempt of Court in giving interview on pending case of Sammons and Neimoth, charged with robbery. of $47,-000 of the Sonneborn payroll, the respondent, through his counsel, filed a motion for new trial.

The theory of counsel, as I understand it, is that this motion would automatically bring the case for review before the Supreme Bench of Baltimore City.

Not entertaining the same views counsel have as to the nature of this case nor as to the character of the jurisdiction of the Supreme Bench of Baltimore City, I passed an order on said motion setting the same down for hearing this morning, in the Criminal Court of Baltimore.

I have no disposition in any way to deny respondent any rights he may have, either of appeal or review, but rather to facilitate him in the prosecution of any real rights which he may possess.

I am of the opinion that the Supreme Bench is wholly without jurisdiction in the premises. That, however, is a matter of interpretation of the constitutional and statutory law of this State. As such, it is a question on which any judge may well be mistaken.

Treating the same, therefore, as motion for a new trial, I overrule said motion. I thus put the respondent in this position: If there is jurisdiction in the Supreme Bench to hear motion for new trial in a contempt proceeding (where the contempt proceeding is not by indictment which may be an alternative form of procedure—but one not adopted in this case), the same as there would be in case of conviction of felony or misdemeanor in the Criminal Court, then the form of procedure now open to the respondent, as it seems to me, would be to file a petition in the Supreme Bench for a writ of mandamus to this Court directing this Court to transmit the record in this case to the Supreme Bench. Needless to say, if said writ be issued, I will most promptly and most cheerfully comply with the same.

Should the Supreme Bench refuse to issue said mandamus, then the respondent may get a ruling on that question of jurisdiction by an appeal to the Court of Appeals of Maryland from the refusal of the Supreme Bench to entertain jurisdiction.

I merely gratuitously suggest these possible alternative forms of procedure, as a disclaimer of any disposition on the part of this Court to circumscribe the rights of the respondent, should he have any legal rights which this Court has not accorded him.

Ralpalje on Contempt, Sec. 1, says:

"Each Superior Court being the judge of its own power to punish contemners, no other Court can question the exercise of that power and the facts constituting the contempt need not be set out in the record."

Notwithstanding this citation of an elementary principle, and irrespective of whether it be dictum or decision, in Kelly vs. Montebello, 141 Md., and Emergency Hospital vs. Stevens in 146 Md. 159, that criminal contempt, in Maryland at least, is not appealable, I think any Court, certainly this Court, would feel more comfortable, if it could know that its decision *is not final;* and that the right of appeal or of review does exist. This question may shortly be decided in this State in the issue that is clearly presented (or I hope it is), in the appeal in the somewhat recent Hearst newspaper *contempt cases. If there is no such*

right of appeal now, because of our status as a common law procedure State, certainly it would be entirely within the province of the incoming Legislature to provide for such right of appeal. I, for one, hope the Legislature in its wisdom may see fit to pass such a statute giving the right of appeal, if it does not now exist. There may be some greater wisdom than I can appreciate for the non-existence of this right, if it does not exist, but if so, at the present time at least, I fail to appreciate it.

Contempt is a summary power latent in courts, and, as Reverdy Johnson said, born of necessity and should be reserved for necessity (or some such language), and I think any court in the exercise of such power would welcome the thought that the just and proper exercise of such power may be reviewed by a higher tribunal. Such, certainly, is my very definite feeling and desire.

I further think, however, it entirely within the province of this Court to treat the present motion not in its technical form as a motion for new trial, but rather as a motion for reargument. If there be any disposition on the part of counsel to further pursue the questions along those lines, I am entirely willing and anxious to entertain such motion, and not only hear reargument, but invite the Bar generally, as well as the Bar Association in its official capacity, to participate in said argument as *amicii curiae*.

While the form in which the question here arises is very simple—the far-reaching effect of the principle involved as presented in General Gaither's testimony and evidently asserted here through the medium of a mere subordinate, induces me to believe that it is the most *fundamental and far-reaching legal question affecting the administration of justice that has arisen in this Court within my generation.* I therefore deem it worthy of the most thoughtful consideration of the profession. It affects not only the Court, in the administration of justice, but the Police Department, the public press, the prosecuting attorney, the defendant's counsel in all criminal cases, the counsel on both sides in all civil and equity causes, as well as all parties litigant in any case. Therefore, the invitation is likewise extended to all newspapers which will ultimately be affected by the final decision in this case, to participate in the argument of a legal question affecting every publisher of news. I am willing to wait such time as may seem reasonable, to ascertain if either the public press, individual lawyers, as *amicus curiae,* Bar Associations, or legal groups of any character, desire to further participate in the discussion of a fundamental principle affecting the administration of justice generally. I am anxious to know how *the professional thought of the community registers.*

Having said this much pertaining to the larger question here involved, I desire to make a few remarks with special reference to the respondent in this particular case, and for the further consideration of counsel of record here.

At the conclusion of argument last Thursday, December 30, I stated that I was willing to leave for mature consideration of respondent, Captain Burns, his counsel and General Gaither (Commanding Officer of Captain Burns and Police Commissioner of Baltimore City) the legal question involved in this case. I stated that my object was to accomplish *something constructive,* and not *destructive,* that all I wanted was to establish, *and have recognized and accepted,* the both definite and ancient principle, that when a case is pending in Court, that is when the parties litigant have invoked the majesty of the law, and availed themselves of our American institutions for the administration of public justice, that they forswear the public forum, the press and the platform, and, having invoked the legal machinery provided by the wisdom of our ancestors for the orderly determination of their rights that they bow to that arbitrament and accept its award; also that in the determination of the matters thereby and therein submitted, they have a right to *expect* and *receive* protection *from any and all outside interference* that has, or may have a tendency to affect the orderly and impartial administration of the laws of the land, which Courts are ordained to administer, and Judges sworn to protect and defend. I therefore merely suggested, that if and when the respondent, with the consent of his superior officer, General Gaither, and the approval of his counsel, saw fit to file a written statement in the

532

case to the effect that *hereafter*, at least, he will make no statement for publication touching the merits or demerits of the evidence pertaining *to any case pending in Court and awaiting trial*, then there will be no further judgment entered in this case — and that the respondent may be discharged without delay. (Q. E. S. D.)

I further stated, that if after mature reflection, General Gaither directed otherwise, that I am prepared to pass judgment in the pending case, but that I wanted to have them fully realize that they were acting with their eyes open — and that General Gaither was taking the full responsibility for the course he may determine upon. I may refer in this manner to General Gaither as Police Commissioner, not only because of the peculiar nature of his testimony on the witness stand in this case, but also because counsel in their argument clearly indicated that he is their *real client* in this case, and Captain Burns, quite apparently, a mere *figurehead*, subject to direction and control of his superior officer, who not only appoints him, *but directs his conduct*. There the acceptance or rejection of my suggestion must be interpreted by this Court as the deliberate decision of General Gaither as Police Commissioner of Baltimore.

Even at the risk of criticism that my present form of expression may not be entirely in accord with the established or customary style of formal legal opinion, may I still suggest to counsel, and to General Gaither as the responsible head of the Police Department of a great city of a million people, that I do not believe either of them fully appreciates the momentous importance of the controversy in which they are engaged or whither it will lead. General Gaither is the head of the Police Department of Baltimore. This City in its budget for this year has appropriated $3,701,270.95 for Police Department maintenance and operation. It has likewise appropriated $372,928 for the administration of public justice by the Courts of Baltimore City. General Gaither is an appointee of the Chief Executive of the State of Maryland for the administration of the police affairs of the City of Baltimore. According to the recent press accounts he has a large program for the increased power of the Police Department of this City, subject to a refer-

endum of the people of this community, with an additional $1,300,000 expenditure.

In the controversy he is directing and conducting in this Court, through the mere figurehead of Captain Burns, one of his subordinates, he is attempting to arrogate to the Police Department of this City under his direction and control, the right to a free exercise of their discretion in giving interviews to the public press commenting on the comparative merits or demerits of important or any criminal cases pending for trial in this Court, and *challenging both the right and the jurisdiction of this Court to interfere with the exercise of the "discretion of the Police Department" to comment on cases pending in Court for trial.* If such principle is ever conceded by the judicial branch of government, then the taxpayers of Baltimore may well be saved the less than one-half million they are appropriating for the orderly administration of public justice, and, in principle, it is only a step, or a matter of gradation, to subscribing to a military or *police dictatorship* in the administration of our Court. Then, whom the police desire to convict they shall be convicted by the manufacture of public sentiment and the use of the agencies of the public press for the creation of public sentiment, limited only by the discretion of the Police Department — and many instances in very recent years have shown that they have neither wisdom nor discretion in such matters compatible with the safe and sound administration of public justice. I do not mean that they have been the only offenders in that line. Public press, defense counsel and public prosecutors must be prepared to also assume their just part of the responsibility for this perfectly valid criticism as to litigation in this community in the not far distant past. All I am interested in doing, is to prevent its recurrence in the future—by inviting the administration back to its ancient moorings and by starting the new year on a more healthy and wholesome basis—to which all right thinking lawyers, as it seems to me. must subscribe. Police officials, if ignorant of the law, and persistent in a stubborn assertion of a right they do not possess, and which right is subversive of the principles of government, *must be made to respect* them.

There is still opportunity to take counsel, and see the light of day, and accept and act accordingly, in order that there may be that co-operation in government that makes for greater efficiency, and that the somewhat over-burdened taxpayers of this community may get in the administration of the Police Department and the Courts of this City, that efficiency and impartiality in the administration of public justice, to which they are entitled by the law of the land. The stream of public justice must run clear and unpolluted by any interference from Police Department, public press, counsel on either side or from extrajudicial activities of parties litigant. In that way, and in that way only, can public justice accomplish the mission for which it was ordained. It cannot accept as a standard the "*discretion*" of the Police Department as to how far its water can be muddied with impunity, because such department does not believe that *in fact* it has muddied the stream. If this discretion is to be conceded to the Police Department, it must, by a parity of reasoning, also be conceded to counsel on each side, and then likewise to the public press, and to the parties litigant. Once conceding that, you have unbridled discretion making for anarchy in its conflict with law.

If General Gaither is disposed to force that issue, this Court is prepared to accept it, and act accordingly and to definitely register its judgment that *it cannot be done*. That very issue thus raised may be reflected in the enlarged program of the Police Department, which may shortly be submitted to the people of this City in the referendum, and may well raise the issue as to whether the people of this City, ever jealous of their legal rights, and interested in the *orderly administration* of justice, *free from police interference* in the trial of cases involving either their lives, liberties or property, are interested in still further increasing the *size*, and augmenting the power of a police department which arrogates to itself the right, in the exercise of its discretion, uncontrolled by Courts, of determining for itself to what extent it sees fit by discussing evidence in pending cases awaiting trial, to have a hand in shaping the verdict of juries and the judgment of Courts in the determination of those cases in which for one reason or another it may be specially interested. That question, if carried to its ultimate and logical conclusion may well divide this community, and array on the one side those believing in the ancient system of the orderly administration of justice uncontaminated, a form of justice where the rights and merits of the cause are to be determined in the *Court, and there only*, and on the other side you may array those who are willing to subscribe to *police domination* and police supremacy. That, in my judgment, is sowing the seeds of anarchy, and a return to the very ancient discarded system of military domination or dictatorship, and I think the principle here contended for by General Gaither through the medium of a non-free agent in Captain Burns, *goes that far.*

Way back in English history, Lord Coke was confronted with the same proposition — which, however, there arose in a different form, but *the principle was the same.* It involved the *extent* to which the Crown could have a hand in shaping the decisions of Courts. Here the question is the extent to which the police can have a hand in shaping the destiny of cases pending in Court supposedly for Court determination — uncontrolled and unaffected by public sentiment shaped by police interviews reflecting departmental policies. When James I undertook to override the English judges by asserting the divine right of kings as a personal prerogative of the ruler to control judicial decision affecting the King, Sir Edward Coke boldly thrust him back to his proper place, and thereby saved the rights of the English people. (See Hallam's Constitutional History, 342). The people of Maryland, sometimes called the "Free State," are legal heirs to those principles involving the right to unpolluted flow of the stream of public justice, early vindicated by the independence of the English judiciary, which has ever since been the rich heritage of our profession and the boast of the American people. The principle must be preserved inviolate, and in the more poetic language of the ancient Courts must "withstand beginnings; a cure is prepared too late, when evils have grown old through long delay." A clear determination by Courts of when a controversy has left the stage of open, unofficial disputation, including press discussion and platform propa-

534

ganda, and has sought refuge in the sanctuary of the law, will add a *dignity* to legal institutions generally and afford a protection to litigants, which neither has of late, in practice, been entirely secure in the enjoyment of. The Courts themselves are largely to blame. They have in many instances sat quiescent and supinely permitted litigants who have sought refuge in their tribunals to be pursued and pilloried there by the public press, by counsel and parties litigant, who have invaded the precincts of the Court, and by popular clamor, more destructive than mob violence, demanded that they be given Barabbas, and Barabbas they have been given, to the everlasting shame of the administration of public justice. Courts cannot wash their hands of responsibility, as Pilate sought to do.

The habitual invasion of the precincts of the Courts by the public press and other extrajudicial activities of counsel and parties litigant, have become so *habitual*, as to almost obliterate the boundary lines of the legal forum. "Freedom of speech" as guaranteed in constitutional reservations has been interpreted as leave and license to make raids on public justice and carry off its victims, oftentimes under the guise of law and under the very nose of the Court. Being judicially lynched under the forms of law and in the presence of a judge has a greater tendency to undermine respect for our American institutions, than an occasional outbreak of the passion of the mob, resulting in loss of human life.

There is not, and should not be, any disposition on the part of Courts to exercise any supervision or control of any other department of government; nor should it brook any invasion of *its* domain by any other agency, public or private, official or unofficial. It should first know the extent and the limitations of its own territory, and then be willing and able to protect and defend them, and all within them.

When parties, forsaking the public forum, come within its domain and seek legal relief in the sanctuaries of public justice, no inroads by the press, police department or other instrumentalities should be permitted. Courts have inherent power to protect litigants from all outside interference affecting, or calculated to affect, the

course of justice. If Courts are to accomplish the mission for which they were ordained, they must have the courage to protect those within their territory. I take it, that when a cause is "*pending*" for determination within their tribunals, there is little room for doubt that the parties litigant have a right to expect and demand legal protection from all outside interference. I think this is the line of demarcation that has not been respected by the press, and by public and other agencies; and that Courts have in a large measure been recreant in not affording adequate protection. I think the continued assertion by Police Commissioner Gaither of a right in his department to comment on pending litigation, subject only to the limitation of "police discretion," if persevered in, may well challenge his competency for his position as head of the Police Department of Baltimore City.

On Dec. 30th, the day of the arguments of counsel in this case, Mr. Charles McHenry Howard was present and indirectly interested in the proceeding as counsel for the Baltimore Sun—(not a party to this proceeding) and was invited to contribute his thought. You will recall, that speaking impromptu, he said that one thing that had struck him *in the arguments made*, was the entire lack of citation of any precedents in support of the theory on which this Court was apparently proceeding, and from that fact, he suggested that the Court was apparently embarking on an "uncharted sea — without either compass or chart." I assume he was confining his observations to the arguments he had *heard* made in the case. I do not view the matter as embarking on an "uncharted sea, without either compass, chart or log book." I can definitely see land ahead and the port to which we are sailing, and the channel has been well marked for centuries and the soundings as to depths and shoals have been taken. I think any department of government or passenger or crew sailing with the ship of state which asserts the right to cause the needle to vary from the pole hinders and impedes its proper navigation—and can neither be permitted nor tolerated nor excused, when asserted as a *right*.

Mr. Howard has suggested that a course of this kind would bring odium on the Judge. That may be true—but

is hardly an argument why it should not be adopted. He spoke somewhat in the spirit of prophesy! Newspaper editors, some of whom are as ignorant of legal procedure and legal precedents even as the distinguished Police Commissioner of Baltimore, or the Captain of Detectives, naturally resent anything that in any way puts the slightest check on what they consider the "divine right of editors,"—to express opinion at any time on any subject in any manner they see fit. Such editorial comment is to be expected. I noticed a few such editorials in a local evening paper since the decision in this case last Thursday—and the end is not yet.

Where the comment is limited to the *personal* abuse of the Judge, and is not of such a nature as to bring the Court, as one of the institutions of American Government, into disrepute, I personally am more disposed to follow the *philosophy* of the old Theodosian Code. It provided that personal slanders on Majesty should go unpunished. The philosophic reasons therefor as given were these:

"(1) If they proceed from levity, they were to be despised.

(2) If from madness, it was to be pitied.

(3) If from malice, it was to be forgiven—for all such sayings were to be regarded according to the weight they bore. Therefore I am disposed to treat them on those principles, until such time as they may justly bring the institution of Courts (as distinguished from the personal attack on the Judge) into disrepute. Then it will be perhaps a duty to the administration of justice *as an institution,* to take notice of them, however personally distasteful such a duty may become to the individual. But Courts should be ever alert not to sacrifice the dignity of Court procedure, and be drawn into citation for contempt where the obvious purpose of the editor or paper is to be a respondent in a contempt citation, for the sole purpose of thereby increasing the circulation of such paper.

The Bar Library was closed over the New Year's holidays, and there was but scant opportunity yesterday to examine legal precedents—as to the supposed "uncharted sea." In the few hours access I have had to books, even a cursory examination shows that we are not lacking for precedents, even of a very similar character.

Perhaps a few citations, collected at one sitting, will suffice to show that the procedure here adopted is neither original, new or unheard of,—but runs hand in hand with the wisdom and growth of the common law.

What higher authority can be desired than decision of the Lord High Chancellor in the High Court of Chancery in England, as to the very definite form of this procedure and its early and continued history?

Is Mr. Howard correct in his suggestion that this procedure *"in its application to cases like the present one, seems totally new?"*

On the contrary, is it not at least over 200 years old?

In 1742 I find a case in which the principle is almost identical with the case at bar. It is the case of the editor or publisher of the St. James Evening Post, reported 2 Atkyns Reports, page 471 (being the reports of the High Court of Chancery of England for that year, with opinion by Lord Chancellor Hardwick). (Affirmed in Rex vs. Tebbits, I. K. B., 1902, p. 77.)

(Facts.) It seems there was a suit pending in one of the civil courts between a Mrs. Roach and the Executor of someone's will. This printing house, operated by Mrs. Read, had accepted for publication and had printed and published, some kind of a pamphlet bearing on the merits of litigation between Roach and the Executor, parties litigant. She, Mrs. Read, the publisher, was cited for criminal contempt for the publication *bearing on the pending litigation.*

The Lord Chancellor in his opinion said:

"There is more encumbent upon Courts of justice than to preserve their proceedings from being misrepresented. Nor is there any thing of more pernicious consequence than to prejudice the minds of the public against persons concerned as parties in cases, before the case is finally heard."

"There are three different sorts of contempt. One kind of contempt is scandalizing the Crown itself."

"There may be likewise a contempt of this Court in abusing parties who are concerned in causes here."

"There may also be contempt of this Court in prejudicing mankind against persons, before the cause is heard."

"There can not be anything of greater consequence than to keep the streams of justice clear and pure, that parties may proceed with safety both to themselves and to their characters. There are several other cases of this kind. One strong instance where there was nothing reflecting on the Court, in the case of Capt. Perry, who printed his brief before the case came on. The offense did not consist in the printing —for any man may give a printed brief, as well as a written one to counsel, but the contempt of this Court was prejudicing the world with regard to the merits of the cause before it was heard. Upon the whole there is no doubt that this is a contempt of Court."

"With regard to Mrs. Read—the publisher of the St. James Evening Post, by way of alleviation, it is said that she did not know the nature of the paper; that printing papers and pamphlets is a trade, and what she gets her livelihood by. But, though it be true, this is a trade, yet they must take care to do it with prudence and caution, for if they print anything that is libelous, it is no excuse to say that the printer had no knowledge of the contents—and was entirely ignorant of its being libelous. And so is the rule of law, and I will always adhere to the strict rules of law in these cases. Therefore Mrs. Read must be committed to Fleet—according to the common order of contempts."

(Note:) It appears, from my reading of the case, that the author of the pamphlet was at that time *already in jail*, and the order seems to be that, *as to him*, he be confined *more strictly* or more close confinement.

Bishop's Criminal Law, Sec. 216, says:

"According to the general doctrine, any publication, whether by parties or strangers, which concerns a *case pending in Court*, and has a tendency to prejudice the public concerning its merits, and to corrupt the administration of justice, or reflects on the tribunal in its proceedings, or on the parties, the jurors, the witnesses, or the counsel, *may be visited as a contempt*."

Patterson (but no "Paul Patterson") on "Freedom of the Press," p. 121, says:

"Courts of law * * * must be credited with sufficient power to vindicate and protect their procedure against attack, for, as Courts are the appointed means of adjudicating on all disputes and for discovering all sufficient materials to that end, their labors would be often futile, if irresponsible volunteers intruded crude opinions and speculations, founded as they must usually be on defective data. The first requisite of a Court of justice is that its *machinery be left undisturbed*, and this cannot be effected unless comments be all but excluded till the Court has discharged its functions."

The learned counsel for Respondent, in the argument of this case. cited the opinion of Chief Justice Taft in the Craig case, 263 U. S. 255.

There is also another paragraph of Chief Justice Taft's opinion in that case which reads, as follows:

"If, however, the publication is intended and calculated to obstruct and embarrass the Court in a pending proceeding in the matter of the rendition of an impartial judgment, the Court may, and it is its duty to protect the administration of justice by punishment of the offender for contempt."

This is the latest expression of high authority that can be found. It seems to me it flatly sustains the position that it is not only within the right of a Court, but its *bounden duty to* protect unpolluted the flow of the stream of public justice.

Instead of sailing aimlessly on an uncharted sea without compass or high authority to guide, it would seem that we have such high and early authority as the Chancellor of England in the High Court of Chancery, in 1742, with the same principle affirmed by the present living Chief Justice of the United States in perhaps the most recent case on the subject.

(Around 1914. 20 Va. L. R. 550.)

A Society newspaper during the progress of the divorce suit of Leslie-Mellville vs. Same, published a racy account of the life of a peer well known to be a co-respondent in the pending suit and gave a lurid description of that nobleman's career as a "heart masher" —well calculated to prejudice the mind of any person who read it.

Mr. Justice Hossige committed the director of the paper whom he regarded as personally responsible for the article, to jail *sine die* until he satisfied the Court he had purged his contempt.

The Court held such an article was *calculated* to prejudice the fair trial of the case, and amounted to a serious interference with the course of justice —and was a contempt of Court.

If law was properly enforced either this practice of assaults on pending litigation would have to be discontinued, or papers would have to be edited from jail.

This extract is from Va. L. R. p. 149:

"On opposite sides of the same newspaper, we found the other day, two very interesting decisions on the subject of contempt. One was in Mr. Justice Seabury's Court in New York City, where three persons connected with the Globe Newspaper Co., the editor, the city editor, and a reporter, were each fined $250, the maximum, for premature publication in the Globe of any advance copy of District Attorney Whitman's opening address to the jury in the Becker case. Whilst thoroughly agreeing in the eminent propriety of these fines, we think their value to the public and to the course of justice would have been very much enhanced by imposing a similar fine on the District Attorney for allowing the speech to get out of his hands before it was delivered. He was certainly particeps criminis. The Globe not only published the speech a day before it was delivered, but also graphically described Becker's appearance during its delivery, and the way in which his wife bit her lips as if to prevent crying out a protest, and the way she leaned over, and made comments on the way things were going. All this, of course, pure imagination. We cannot forbear quoting the language of the learned judge, and in addition calling the attention of those keenly interested in the cause of justice to the inadequate way in which the Courts of this State and those standing at their bar, are protected from the assaults of the "yellow press." Men and women are tried; are convicted by penny-a-liners, regardless of anything beyond their ten dollars a column, before they are indicted by a grand jury. Allegations— often absolutely without the slightest basis of fact—are made; damning evidence is displayed in huge headlines, and though proved afterwards to be false, no correction is made; the public mind is warped, prejudiced, and inflamed, and the accused is invited to "prove his innocence" instead of standing innocent until convicted.

Mr. Justice Seabury said:

"Judicial proceedings in the Courts of this country are pre-eminently misrepresented in the public press, and the administration of justice is thereby embarrassed and impeded. The power of the Courts in this State to protect the administration of justice from this abuse is very limited. In England, Massachusetts, and New Jersey, and in some of the other States, the Courts are clothed with ample power to correct such abuse. The Courts of this State, however, have conferred upon them power to punish as contempt the publication of a false and grossly inaccurate account of its proceedings. Not only was the address of the District Attorney not delivered, but the alleged description of the effect of the address upon the defendant and his wife, shows the utter disregard of truth which actuated those responsible for its publication, and the reckless manner in which so-called 'news' is manufactured."

"Under the circumstances, I feel that I have no right to ignore this offense. To do so would reflect upon the administration of justice. I do not wish to act harshly or to humiliate by imprisonment those responsible for this contempt. I do feel that the punishment to be imposed should be sufficient to emphasize the reprehensible character of the act, and to serve as a warning in the future, which may deter others from repeating it."

(20 Virginia Law Register, 149.)

From 28 Harvard Law Rev. p. 606, is the following:

"But any attempt by a newspaper independently to run down clews ahead of their appearance in Court, to supplement the trial by the publication of facts not appearing in the testimony, to print evidence which the Judge rules inadmissible, to report arguments which take place while the jury are excluded, or to give partisan comment upon the testimony either directly or by subtle innuendo of headlines should be severely frowned upon and punished by imposition of heavy fines if necessary."

Daws vs. Eley (1868) 7 Law Rep. Eq. Cases, 49.

Pending litigation over a patent, letters sent to the paper pending litigation editorial comment on same. (Interesting facts—but too long for present abridgement.)

538

Lord Romilly, M. R.:

"The principle is quite established in all these cases, that no person must do anything with a view to pervert the source of justice—or the proper flow of justice—in fact, they ought not to make any publications, or write anything which would induce the Court—or which might possibly induce the Court, or the jury, the tribunal that will have to try the matter, to come to any conclusion other than that which is to be derived from the evidence in the case between the parties; certainly they ought not to prejudice the minds of the public beforehand by mentioning circumstances relating to the case * * *. It (Court) must stop the publication where the evident result would be to affect the administration of justice—though that might not have been the intention of the person who did it.

Mr. Collet, the solicitor who furnished the letter for publication, was committed for contempt, and sentence suspended two weeks to give him time to make apology if he desired.

(1873) Onslaw and Wholleys case, 9 Law Rep. Q. B., p. 219.

Public meeting to raise funds for one accused of crime—at meeting animated speech abusive of courts and discussing merits of case in pending prosecution in inflammatory manner — see details p. 225.

Opinion by Cockburn, C. J., fixed 100£, imposed on fiery speaker and complimented the metropolitan press for failing to give to the occasion that publicity for which the meeting was evidently ordained.

(1889) Hunt vs. Clark, 58 Law Journay Rep., Queen's Bench Div., p. 490.

(Syllabus.) "The publication in a newspaper pending action, or before the trial of an action, of any observations which in any way prejudiced the parties to the action, is technically a contempt of court. But the court will not exercise its extraordinary power of committal if the offense complained of is of a slight or trifling character, but only if it is likely to cause some substantial prejudice to the parties to the action."

Telegraph Newspaper Co. vs. Commonwealth, 172 Mass. 294; 298.

(1899) Facts: Civil suit on trial—apparently condemnation proceeding regarding value of land.

Paper printed article regarding case containing the language "The town offered the plaintiff $80, but he wanted $250."

Paper cited for contempt of court by its own motion.

Field, C. J., p. 298.

"When it comes in any manner to the knowledge of the presiding judge of a court that articles are published in a newspaper circulated in the place where the court is held which are calculated to prevent fair trial of a cause then on trial before the court, the court of its own motion can institute proceedings for contempt. * * * If the publication amounts to a contempt of court because it interferes with the due administration of justice in a cause before the court, the contempt is analogous to a contempt committed in the presence of the court."

Affirmed lower court adjudging paper in contempt.

(1924) Myers vs. U. S., 264 U. S. 95, is even a more recent pronouncement by U. S. Sup. Court than the Craig case.

The written opinion of Chief Justice Taft was already cited. Mr. Justice McReynolds, speaking for the Court, construes Clayton Act of 1914, and contempt proceedings, as follows:

"These (contempt proceedings) are *sui generis*—neither civil actions nor prosecutions for offenses, within the ordinary meaning of those terms—and exertions of the power inherent in all courts to enforce obedience, something they must possess in order properly to perform their functions.

"To disobey a judicial order is not declared criminal by the Clayton Act. It recognizes that such disobedience may be contempt and, having prescribed limitations, leaves the court to deal with the offender. While it gives the right to trial by jury and restrict the punishment, it also clearly recognizes the distinction between 'proceeding for contempt' and 'criminal prosecution.'

"While contempt may be an offense against the law and subject to appropriate punishment, certain it is that since the foundation of our government proceedings to punish such offenses have been regarded as *sui generis* and not 'criminal prosecutions' within the Sixth Amendment or common understanding."

(Note) : This case has special bearing on respondent's contention of a right of review by Supreme Bench as in other criminal cases.

(1907) Patterson vs. Colorado, 205 U. S. 454.

By Justice Holmes.

But if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward such an interference, it may punish it as in the instance put.

(462) "A publication likely to reach the eyes of a jury, declaring a witness in a pending case a perjurer, would be none the less a contempt that it is true.

It would tend to obstruct the administration of justice, because even a correct conclusion is not to be reached or helped in that way if our system of trials is to be maintained. The theory of our system is that the conclusion to be reached in a case will be induced only by evidence and argument in open court, *and not by outside influence whether of private talk or public print.*" (Italics mine.)

(1884) W. Va. vs. Hart, 24 W. Va., p. 417-493.

Interesting case too long to abridge —nearly 100 pages.

Publication in a newspaper in a city where court is sitting with reference to a case pending and undetermined and reflecting on the court as to the decision in that case is a contempt of court which may be summarily punished. Editors fined.

(1877) Bawden vs. Russell, 46 Law Journal. Chancery, p. 414.

(Syllabus.) If a plaintiff's statement of a claim in an action contains charges injuriously affecting the defendant's character, and if plaintiff before hearing the action sends copies of the statement to persons not parties to the action, he is guilty of a contempt of court, and will be restrained from further publishing the statement and ordered to pay the costs of a motion to commit him.

Extracts opinion of court:

"Having regard to the principles which I have enumerated, it is difficult to conceive anything more calculated to interfere with the due course and administration of justice, than for a plaintiff to file a statement of claim which may be untrue, and which the defendant may not immediately be able to answer, and then publish that statement to all the world."

(1890) Ex parte Green vs. in re Robins & Press Asso.

Comment that a suit filed would not be contested and an apology made and damages assessed, etc.

In justice of article called to attention of publisher by party interested, paper retracts, but refuses to declare source of information. Rule and citation for contempt, but because of retraction, let off with costs of contempt proceeding.

(Note) : Case not on trial, but merely docketed and thus "pending."

Opinion by Mr. Justice Cave.

Sir Charles Russell, one of the counsel in the case.

(1894) Birmingham Vinegar Brewery vs. Henry. 10 Weekly Rep., p. 586 (Queen's Bench). Publication of article pending trial, etc.

Mr. Justice Wills said that there was a great and mischievous tendency to publish articles of this sort at present time. If it went on it would lead to trials by newspapers instead of in the proper tribunals of this country.

That was the result that writers of such articles aspired to. It might be, that on the present occasion the defendant had not tainted the course of justice—but he had certainly done his very best to do so. He would well deserve to be attached as an example to others.

(1894) In re Pall Mall Gazette, 11 Times L. Rep. 411.

Article in Pall Mall Gazette. "Promoters and Solicitors," referred to a pending case not yet heard. Paper claimed good faith, honest mistake, etc., no intent to injure, or affect case. Judge characterized paper nevertheless as careless. Convicted of contempt and fined small fine and costs of contempt proceedings.

(1869) Robinson vs. Dobbs, 17 Weekly Rep., Chancery, p. 782.

A paper had published comments on the conduct of a gentleman who had formerly been solicitor to a building society, pending the hearing of a suit by him against the building society.

Editor ordered to apologize and in default to be committed to jail.

The court said "That it is no doubt of the highest importance to the public

that the press should be as much as possible unrestricted—but it was also of equal importance that the due administration of justice should not be interfered with by newspaper comments tending to bias the mind in favor of one side or the other. He said, proceeding on the decision of Lord Hardwick in the well-known case of St. James Evening Post, 2 Atk. 469, which had been followed by Vice-Chancellor Wood in Tichborne case, 15 W. R. 1072, his honor held that the article in question was calculated to prejudice the public mind against the parties to a suit before the same was heard, and therefore amounted to a contempt of court, and that an apology must be made as a condition of the court refraining from committing the defendant and that the order would be that he stand committed (but that it would not be enforced for three weeks).

I suppose to give him time to cool off and think it over.

Therefore it would seem that from 1742, St. James Post case to this case, 1869, over a hundred years—the channel of legal procedure has been definitely marked by decisions of high authority and is not an uncharted sea!

In this case a week ago, respondent was advised that judgment would be stayed on filing a disclaimer of any right to comment for publication on any pending case—and a statement that he therefore would not in the future do so. If he prefers judgment instead of such disclaimer, it is within his province to submit to judgment and in such case this Court is prepared to pass it in no uncertain terms.

The paragraph of the published interview, admitted in the sworn answer of the respondent, is as follows:

"However, we wanted Niemoth first, because we have a much better case against him. We figured that Sammons had been 'sent in,' in an attempt to find out just how much we had on Neimoth. Consequently, we sat tight and let him go. Our plan worked well, and we do not expect much difficulty in arresting Sammons, who thought he had been cleared of suspicion in the case."

The legal principle is that as to a pending case, anything that has, or may have, a tendency to hinder, impede or obstruct the administration of justice, is a contempt of court.

It is not necessary that it *actually* impede, or hinder, or obstruct justice. If it *does*, it is a distinct *statutory* crime in Maryland and indictable as such.

Under the common law, it is sufficient, for the purpose of contempt, that it *may* or *might*, have that effect.

Could this statement either hinder or impede the administration of justice?

It is apparent from the very text of the interview, that Captain Burns believed Sammons, at the time, to be at large, unapprehended, and at the same time wanted in Maryland by the State as one charged with the robbery of $47,000 in the Sonneborn payroll cases.

He knew also, from his own testimony, that Sammons had been arrested in Chicago November 13th and turned loose. He knew or ought to have known that a statement such as he gave, broadcasted in the press, local and elsewhere, would reach Sammons. He must know that criminals are as well organized as any Police Department, and that in the warfare against crime, criminals employ all the modern devices of science and have a well organized "intelligence bureau," if I may use the term, of their "outside men," "lookouts," etc. This statement was well calculated to convey to Sammons the information that, whereas he may have had reason, on the face of the proceedings, to think that he had been merely arrested on suspicion, found to be not wanted, and might therefore well be careless as to his whereabouts —not suspecting that he would be wanted later. This conveyed publicly the information that he was wanted, and that his release was a mere trap for his later apprehension—with others. This, of itself, might well hinder and impede justice in his apprehension. The law books contain cases where grand jurors have been convicted of contempt of court for merely disclosing that certain defendants have been "presented" —where they have not as yet been *apprehended*.

Furthermore, Captain Burns knew at the time of giving this interview that Sammons had, that very afternoon, been indicted by the grand jury, and that the three detectives working under his direction on the case had just come fresh from the grand jury testifying there as a basis for the indictment of Sammons.

Only four hours before the interview a true bill had been returned against Sammons. Sammons was shortly after arrested in Chicago, and some time thereafter, not definitely fixed in this record, he escaped from jail in Chicago. If this information given out by Captain Burns reached him in Chicago either before or after his arrest, it brought home to him direct knowledge of the serious charges against him in Maryland, and disclosed the secret attitude of the Detective Department in his case. This may well have stimulated him to escape, and for all we know, *may have been the direct and impelling reason for his escape.* Definite advices from Chicago reached me fifteen minutes before the argument of the contempt charge against Captain Burns, that Sammons had in fact escaped after being apprehended in Chicago where a representative of the State's Attorney's office of Baltimore is in charge of Maryland application for his requisition on requisition papers signed by this Court and honored by the Governors of Maryland and Illinois.

Can anyone seriously contend that the exercise of that kind of so-called "discretion" by the Detective Department of Baltimore, has no tendency to hinder or delay or impede the administration of justice? Can anyone confidently assert that it has not, in this case, *actually obstructed* criminal justice in Maryland?

Let us now look at the interview from an entirely different aspect. The statement is to the effect that "Maryland has a *much better case* on Neimoth than it has on Sammons." With an indictment pending against each, each charged with a $47,000 robbery, and in a case in which some one was also killed, in addition to the robbery, what right has any detective to comment publicly on the *relative strength* of the evidence and to publicly draw a comparison between the *strength* of the two cases. Suppose, for the mere sake of argument, Neimoth were here and on trial, and be not convicted, and that Sammons should be later apprehended and placed on trial, and Captain Burns be called by the State as a witness, and that under cross-examination by astute counsel, he be asked, "Did you not publicly say that you had a much stronger case on Neimoth than you had on Sammons?" Can anyone say that that line of examination and

that kind of admitted statement, could not have any tendency to hinder or impede the administration of Maryland justice?

And in the morning's press we read the startling news that Chicago Courts have disallowed the requisition for Neimoth. In the meantime, Sammons is still at large, and fortified now with the statement in public print of the Chief of Detective Captain Burns, that Maryland had a much stronger case on Neimoth than it has on Sammons. Contempt of Court bordering closely on actual obstruction of justice under the Maryland Statute.

Furthermore, may not the publication of that kind of a statement *unconsciously* find lodgment in the mind of jurors who may be drawn for the trial of such case if it ever comes to trial, if Sammons shall hereafter be apprehended?

Does not the necessary discussion *of these very details*, based on that admitted publication, *in itself*, have a tendency to undermine the strength of the State's case, or increase its burdens in the trial of such case, and thereby have a *tendency* to impede justice?

Is not the very admitted interview, the strongest possible proof of the *wisdom* of the common law, making *all* discussion of the evidence in pending cases, a contempt of Court?

Is it not proof, convincing, of the utter *folly* of the position contended for by Police Commissioner Gaither, in the right of the sub-heads of his department, in the exercise of their "police discretion," to make such comments as they see fit, on pending case, and to draw no distinction between a case *pending* in Court and a mere "suspect," against whom they are gathering, or attempting to gather, information?

"In all popular governments, a *Free Press* is the most important of all agents and instruments. It not only expresses public opinion, but, to a very great degree, it contributes to form that opinion. It is an engine for good or evil, as it may be directed; but an engine of which nothing can resist the force. The conductors of the press, in popular governments, occupy a place, in the social and political system, of the very highest consequence. They wear the character of public in-

structors. Their daily labors bear directly on the intelligence, the minds, the taste, and the public spirit of the country. Not only are they journalists. recording political occurrences. but they discuss principles, they comment on measures, they canvass characters; they hold a power over the reputation, the feelings, the happiness, of individuals. The public ear is always open to their addresses, the public sympathy easily made responsive to their sentiments. It is indeed, Sir, a distinction of high honor, that theirs is the only profession expressly protected and guarded by constitutional enactments. Their employment soars so high, in its general consequences it is so intimately connected with the public happiness, that its security is provided for by the fundamental law. While it acts in a manner worthy of this distinction, the press is a fountain of light, and a source of gladdening warmth. It instructs the public mind, and animates the spirit of patriotism. Its loud voice suppresses everything which would raise itself against the public liberty; and its blasting rebuke causes incipient despotism to perish."

So spoke Daniel Webster at the National Republican convention in Worcester, Mass., in 1832.

It follows, therefore, that hand in hand with so great a power, goes the reciprocal responsibility of respecting the legal rights of humble litigants who have sought the sanctuary of the temples of justice, and must be protected thereafter from power so great with which otherwise they could not cope. Public justice alone must be more potent in securing justice than the public press.

"Justice, Sir, is a great interest of man, on earth. It is the ligament which holds civilized beings and civilized nations together. Wherever her temple stands, and so long as it is duly honored, there is a foundation for social security, general happiness and the improvement and progress of our race. And who ever labors on this edifice with usefulness and distinction, whoever c l e a r s its foundations. strengthens its pillars, adorns its entablatures, or contributes to raise its august dome still higher in the skies, connects himself in name, and fame, and character, with that which is and must be as durable as the fame of human society."

Thus also spoke this same great lawyer and statesman, some ten years later when addressing the professional thought of the Suffolk Bar in the Circuit Court room at Boston.

I have tried in my feeble but at least determined way, to mark the bar of justice over which none shall pass; to indicate to litigants and persons accused of crime, that while in the sanctuary of public justice they shall be protected from the inroads of the public press and from raiders and marauders generally—regardless of the uniform they wear. I have striven in the limited time available for legal research yesterday, and last night, to invite my professional brothers to both a retrospective and prospective view of the majesty of public justice. Happily for me this is the last day that I shall preside in the Criminal Courts of Baltimore, for many years to come. If I have helped in any way to clear the foundations or strengthen the pillars or raise its august dome one jot higher in the skies, my year's service in this somewhat turbulent war with crime, will not have been wholly vain.